1

2

3

4

5

6

7

8

9          IN THE UNITED STATES DISTRICT COURT

10          FOR THE DISTRICT OF OREGON

11          PORTLAND DIVISION

12  DAVID GRIMMETT,                    )
                                       )
13                  Plaintiff,         )
                                       )    No. CV-10-241-HU
14       v.                            )
                                       )
15  KNIFE RIVER CORPORATION -          )
    NORTHWEST, an Oregon               )
16  corporation, dba KNIFE RIVER       )    OPINION & ORDER
    an MDU RESOURCES COMPANY,          )
17                                     )
                    Defendant.         )
18  ──────────────────────────────────)

19  Kevin T. Lafky
    Haley Percell
20  LAFKY & LAFKY
    429 Court Street NE
21  Salem, Oregon 97301

22       Attorneys for Plaintiff

23  Jens Schmidt
    Kate G. Watkinson
24  HARRANG LONG GARY RUDNICK, P.C.
    360 East 10th Avenue, Suite 300
25  Eugene, Oregon 97401-3273

26       Attorneys for Defendant

27  / / /

28  / / /


1 - OPINION & ORDER

HUBEL, Magistrate Judge:

Plaintiff David Grimmett brings this employment discrimination case against his former employer defendant Knife River Corporation. Specifically, plaintiff brings a race discrimination claim under 42 U.S.C. § 1981, and a supplemental state claim for intentional infliction of emotional distress (IIED).

Defendant moves for summary judgment on both of plaintiff's claims. Both parties have consented to entry of final judgment by a Magistrate Judge in accordance with Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c). I grant the motion in part and deny it in part.

BACKGROUND

Defendant Knife River Corporation is in the construction business and operates from multiple locations in Oregon providing aggregate, asphalt, building materials, construction services, and ready mix concrete for customers in both the public and private sectors.

Plaintiff is African-American and began working for defendant in July 2005 as a general laborer on a paving crew out of defendant's Coffee Lake location, south of Portland. Because the job was too physically demanding, plaintiff requested and received a transfer to defendant's Waterview Sand & Gravel location. He was a groundsman, with his primary duties keeping the machinery and equipment at the site clean. He also drove a haul truck. Typically, there were eight to ten employees on site during his shift. All but one of the other employees were Caucasian, including Jeremy Russell, plaintiff's supervisor, and Dennis Druery, the site superintendent.

2 - OPINION & ORDER

I.  Incidents at Waterview

Plaintiff worked at Waterview from August 14, 2005, until December 2006.  During that time, he worked with a Caucasian employee named Steve Wetten.  Wetten used the term "nigger" around plaintiff, stating it a little less frequently than every week.  Pltf Depo. at pp. 43-44.  Wetten admits he used the word "nigger" around plaintiff in the workplace.  Wetten Depo. at  pp. 10, 17.  Plaintiff explained that Wetten used the term "nigger this" or "nigger that" and at times he would apologize, but then the next week he would say the same thing again.  Id. at p. 43-45.  Wetten referred to rocks in the pit or the road as "little nigger heads." Id. at p. 44; see also Wetten Depo. at pp. 10-11 (used term "nigger heads" when referring to big rocks within a roadbed, "explaining" that this is a term used for over 100 years by road builders).

Separately, Wetten referred to malfunctioning equipment as "nigger-rigged" and "African ingenuity."  Wetten Depo. at p. 17.  When he first used the term "nigger-rigged," plaintiff complained to Wetten about it, and according to Wetten, two or three weeks later, Wetten used the term "African ingenuity."  Id. at pp. 17-18; see also Druery Depo. at p. 14 (heard Wetten use term "African ingenuity" the day after hearing him use term "nigger-rigged").

On a separate occasion, plaintiff heard a different Caucasian employee at Waterview, Wes Henshaw, state over the radio that "Dave's black ass is going to work today."  Pltf Depo. at p. 47.  Plaintiff states that he confronted Henshaw about it.  Id.  Wetten testified that Henshaw used the word nigger around plaintiff.  Wetten Depo. at pp. 11-12.

Plaintiff states that Wetten's references to "nigger" went on

3 - OPINION & ORDER

for about a year, and at some unspecified point, plaintiff reported Wetten's frequent use of the word "nigger" to Russell, his supervisor, and site superintendent Druery. Pltf Depo. at pp. 43-44. Plaintiff testified that Druery and Russell themselves overheard Wetten's use of the word and to plaintiff's knowledge, they never did anything about it and Wetten received no discipline. Id. at pp. 43-44.

Druery states he was present when Wetten used the term "nigger-rigged" to describe how Wetten had repaired or rigged a piece of equipment. Druery Depo. at p. 12. Plaintiff was also present. Id. According to Druery, as soon as Wetten used the term, Druery "instantly" looked at plaintiff, plaintiff was looking at Druery, and Druery told Wetten "outside." Id. Wetten went outside where Druery said, "bluntly, . . . make no mistakes about it, that if I ever heard him say anything like that again, that he would just be gone." Id. at pp. 12-13. Druery testified that plaintiff had not complained to him about Wetten before this incident and did not complain after the incident. Id. at p. 13. Plaintiff did not complain to Druery about other employees making racial slurs. Id. at p. 14. Druery also stated that Russell never told Druery that plaintiff had complained to him about Wetten making racial slurs. Id. at p. 13.

According to Druery, the very next day after telling Wetten he would be gone if he said anything like that again, Wetten used the term "African ingenuity." Id. at p. 14. Although there were other people present, Druery could not remember one way or the other whether plaintiff was one of them. Id. Druery does not recall saying anything to Wetten because he did not think he had to. He

4 - OPINION & ORDER

states: "I don't even think I had to say anything.  I just looked at him and I was like, seriously. . . . I might have told him to shut up or something.  I don't know."  <u>Id.</u> at p. 15.  There is no written documentation about the incident.  <u>Id.</u>

Plaintiff worked at Waterview until he went on medical leave in December 2006.  He returned to work in February 2007 and was assigned work as a loader operator at defendant's Linnton ready mix site.

## II.  Incidents at Linnton

The crew at Linnton consisted of six or seven other employees during plaintiff's shift, including one African-American[1], one Hispanic, and at least one woman.  When plaintiff first started there, the site superintendent was Jim Dumolt.  Dumolt retired in the spring of 2007 and was replaced by Kermit Achenbach who became plaintiff's immediate supervisor.

According to plaintiff, on or about May 18, 2007, Achenbach had asked plaintiff to use the loader to put up a sign.  Plaintiff got the loader and approached the batch office, stopped the loader, and got out to ask Achenbach and Joe Robertson, a co-worker who was the senior ready mix driver at Linnton, to help him put the sign into the loader.  Pltf Depo. at pp. 77.  Plaintiff apparently neglected to set the parking brake, and the loader bumped into the batch office.  <u>Id.</u> at pp. 77-79.  Plaintiff got out of the loader

---

[1] The other African-American employee at Linnton was Jarvis Campbell, who is also a plaintiff in a case against defendant. That case, pending in this Court and assigned civil case number CV-10-242-HU, is a companion case with the instant case, but has not been consolidated.  They remain separate cases and I treat them separately.

1    was approaching the office when he overheard Achenbach and
2    Robertson speaking and refer to him as a nigger. Id. at pp. 77-80.
3    He indicated that it could have been either one of them, or both,
4    using the word. Id. at p. 80. Plaintiff received a verbal warning
5    from Don Kincaid, defendant's Metro Ready Mix Operations Manager,
6    regarding his causing the loader to bump into the entry deck of the
7    batch office. Deft Exh. 7 at p. 2.

8        Plaintiff states that one of his co-workers at Linnton, Eric
9    Branson, told plaintiff that he (Branson) had overheard Achenbach
10   and Robertson use the word nigger in reference to plaintiff and
11   Campbell. Pltf Depo. at pp. 86-87, 96. In addition, two other co-
12   workers, Denni Chrisler and Sam Castillo, told plaintiff that they
13   heard Achenbach or Robertson use derogatory words towards plaintiff
14   and Campbell. Id. at p. 96. Castillo states that he overheard
15   Achenbach say, "[t]hat stupid fucking nigger, can't back it up, the
16   truck," in reference to Campbell trying to back up one of the
17   trucks in the dark. Castillo Depo. at p. 29.

18       On a separate occasion, another of plaintiff's Linnton co-
19   workers, Susan Erwin, used the term "nigger-rigged" when referring
20   to the "really, really old" condition of the plant and the fact
21   that it would break down. Erwin Depo. at p. 26.[2] At the time,

22

23       [2] In the summary judgment record in the Grimmett case, the
24   record is unclear as to when this happened. The record developed
     in the Campbell case, however, indicates that this incident
25   occurred in September 2009, after Grimmett was terminated.
     However, as I announced at oral argument, because the cases are
26   not consolidated and are pending here as separate, individual
     cases, I consider each record separately. Thus, for purposes of
27   the summary judgment motion in Grimmett, because there is no
     evidence of when Erwin made the comment and I construe all
28   inferences in favor of plaintiff, I consider the comment to have

6 - OPINION & ORDER

Erwin was with Peter Nontavarnit, John Ratcliff, and Campbell. Ratcliff is African-American. Plaintiff was not there.

Immediately after using the term, Erwin apologized to Campbell and Ratcliff told her not to worry about it. Id. at p. 30. The record is unclear as to how management became aware of Erwin's comment, but at some point Brian Gray, defendant's Metro Vice-President - General Manager, called and talked to her about it and determined, apparently, that it was an "accident." Id. at p. 27. Erwin assured Gray it would never happen again. Id. It is unclear when this call occurred.

Nontavarnit heard Robertson use racial slurs such as "wetback," "spic," and "beaner," a handful of times. Nontavarnit Depo. at pp. 34-35. He also heard Achenbach use the term "beaner" as well. Id. at p. 35. Other drivers would make comments to Nontavarnit, who is Asian, about "Asian drivers." Id. at pp. 38-39.

Nontavarnit testified that he heard Achenbach make comments about wanting to get rid of plaintiff. Id. at p. 32. According to Nontavarnit, Achenbach complained that plaintiff wasn't pulling his weight and he wanted to get rid of him. Id. at pp. 32-33. Nontavarnit denied that Achenbach had a specific plan in mind. Id. Nontavarnit further stated that he heard Robertson state that he also wanted to get plaintiff terminated or make him quit. Id. at p. 36. Nontavarnit could not recall how many times he heard Robertson make such comments. Id.

In August 2007, plaintiff contacted defendant's Human

_____

been made during plaintiff's tenure at Linnton.

7 - OPINION & ORDER

1  Resources Director Sarah Stevens (formerly Sarah La Chappelle), to
2  complain about the racial name calling.  Pltf Depo. at p. 102.
3  Approximately two weeks later, Stevens interviewed plaintiff,
4  Achenbach, and others.  Id. at pp. 102-03.

5      Stevens's written investigation report suggests that plaintiff
6  contacted her on August 27, 2007.  Pltf Exh. 9 at p. 12 (Depo. Exh.
7  36).  She spoke with plaintiff, Achenbach, Robertson, and Campbell.
8  Id.  Plaintiff had identified Robertson as the "main instigator,"
9  but also indicated that Achenbach was involved.  Id.  In the
10  "relevant facts" section of her report, Stevens noted that both
11  plaintiff and Campbell did not like the manner in which Robertson
12  bossed them around.  Id.  They characterized him as disrespectful
13  and a jerk.  Id.  Stevens noted that an individual that plaintiff
14  and Campbell refused to name to Stevens, had told both plaintiff
15  and Campbell that this person had heard Robertson, in the office,
16  on the phone with his wife, refer to plaintiff as a "lazy nigger."
17  Id.  Plaintiff and Campbell had promised this individual
18  confidentiality so they refused to name the person to Stevens.  Id.
19  Achenbach denied ever using the word nigger.  Id.  So did
20  Robertson.  Id.  Stevens noted that in her interviews, "[s]everal
21  references to racial terms were brought up by different people, as
22  used in 'joking,' with others such as 'spick' [sic] and 'crout'
23  [sic] and 'this black man' etc.  None of these were made or in
24  reference to [plaintiff.]"  Id.

25      As for her conclusions, the only conclusion Stevens made
26  regarding the use of racial slurs was that "[t]he culture at
27  Linnton uses racial terms and it is unacceptable, however, there is
28  not a pattern of racial comments or otherwise harassing or

8 - OPINION & ORDER

discriminatory activity going on at Linnton with regard to [plaintiff]." Id.

Her recommendations were: (1) Gray and Kincaid were to meet with Achenbach and "lay out formal expectations of him as a supervisor and his obligations to ensure a work environment free of harassment and discrimination of any kind"; (2) "[p]lan and conduct supervisory training on the topic of harassment (sexual and racial and otherwise respectful behaviors)"; (3) "[r]eassign work assignments such that [Robertson] is not in a supervisory role"; and (4) "[e]nsure [plaintiff] understands his job responsibilities include plant maintenance, cleanup and labor. Ensure [plaintiff] knows that we do not tolerate harassing or discriminatory activity and that if he witnesses or experiences anything of this nature, to bring it to the attention of management." Id. In describing these recommendations in deposition, Stevens noted that none of the "outcomes" was "disciplinary exactly." Stevens Depo. at p. 29.

Stevens believes Kincaid met with the crew, as noted in her second recommendation, to make sure that there should be no comments or joking about race, sex, or religion. Stevens Depo. at p. 28. She was not present for the meeting, however. Id.

Plaintiff testified that he subsequently called Stevens, maybe twice, he could not recall, and left her a message, but he never heard back from her. Pltf Depo. at p. 112. At some point, he contacted Gray and left a message for him. Id. at pp. 112-13. He could not remember when this was, but it was after he had left a message with Stevens. Id. He indicated that it took Gray three weeks to get back to him. Id.

Plaintiff explained that he called Gray because "there wasn't

9 - OPINION & ORDER

nothing moving and it was just business as usual." Id. at p. 113.
He indicated that the harassment, including the derogatory talking
and the name calling, had continued. Id. at p. 114.

On October 11, 2007, Kincaid put Achenbach on a performance
improvement plan as a result of recommendations by Stevens in her
report. Deft Exh. 7 at pp. 11-12; Kincaid Depo. at pp. 39-40, 51.

On or about October 12, 2007, Kincaid met with Achenbach and
plaintiff to discuss and outline plaintiff's duties as a ready mix
loader at Linnton. Deft Exh. 7 at pp. 3, 4. A "duties list"
outlined the specific responsibilities of the position. Id. at p.
4. Gray stated that he and Kincaid discussed the meeting, although
Gray did not attend. Gray Depo. at p. 35. The purpose of the
meeting, according to Gray, was to clearly identify plaintiff's
responsibilities. Id. He also noted that there had been some
complaints that plaintiff had been lazy and unwilling to get off
the loader. Id.; see also Stevens Depo. at p. 29 (Kincaid was to
make sure plaintiff understood what his full responsibilities were
as a loader-operator, so that there weren't any issues about what
he was expected to do, which would include getting off the loader
and helping with other things at the Linnton plant). Plaintiff
stated that he was frustrated with Robertson issuing instructions
to him and he believed that the meeting Kincaid held with Achenbach
and plaintiff regarding plaintiff's job duties was to clarify with
both of them what plaintiff's responsibilities were in light of
this issue with Robertson. Pltf Depo. at pp. 131-32. Plaintiff
appreciated Kincaid's attempt at this clarification. Id. at p.
133.

On or about May 21, 2008, plaintiff got into a heated

10 - OPINION & ORDER

discussion with his co-worker Castillo. Castillo Depo. at p. 35. Castillo told plaintiff to "get his fat ass off the loader," and plaintiff called Castillo a "wetback." Id. Nontavarnit witnessed the incident. Id. Achenbach was either there or very close by because Castillo states that Nontavarnit "was there, and then [Achenbach] came out." Id. at p. 34. The incident was resolved at the time and plaintiff and Castillo apologized to one another. Id. at p. 36.

In the summer of 2008, plaintiff walked into the office at the Linnton site and saw a picture of then presidential candidate Barack Obama. Pltf Depo. at p. 138. As described by Campbell, there were two pictures on one piece of paper. One was of a monkey with Obama's face on it and the other was Obama in traditional Middle Eastern style clothing, with a caption asking "do you want this to be your president." Campbell Depo. at pp. 167-68 (describing two separate pictures); see also Pltf Depo. at pp. 138-40 (describing seeing picture with Middle Eastern headdress and indicating he saw only that one picture).

Plaintiff was frustrated and angry. Pltf Depo. at pp. 140-41. He walked out of the room. Id. He does not know who put the photos there. Id.

Plaintiff was terminated on November 14, 2008. Before he was terminated, he was called into the office to meet with Gray and Kincaid. Pltf Depo. at pp. 153-55. According to plaintiff, Gray told him he was being "laid off or terminated, whatever." Id. at p. 154. They met for ten to twenty minutes and plaintiff received his last check. Id. They asked him to sign papers giving him an additional two months of pay in exchange for a release. Id.

11 - OPINION & ORDER

Plaintiff declined to sign the release because he had never been laid off from a job where he had been asked to sign a release or waiver of claims. Id. at pp. 154-55. It did not make sense to him. Id. at p. 155. Plaintiff contends that during the meeting, Gray said to Kincaid that Dave Bull, the president of the company, would be "glad to get this one," referring to plaintiff, to sign the release papers. Id. at p. 155.

The written termination notice lists "Laid Off" as the reason for the termination. Deft Exh. 7 at p. 7. It explains that plaintiff's position as the loader operator at Linnton was eliminated due to the slow economy. Id. Because he did not possess a commercial driver's license, a driver's position was not offered. Id. He was rated "average" in several work categories except for "quantity of work," in which he was rated "fair," and under "attitude," he was rated both "average" and "excel." Id. Defendant indicated it would re-employ plaintiff. Id.

                              STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then

1   moves to the opposing party, who must present significant probative

2   evidence tending to support its claim or defense.'"  Intel Corp. v.

3   Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)

4   (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th

5   Cir. 1987)).  The nonmoving party must go beyond the pleadings and

6   designate facts showing an issue for trial.  Celotex, 477 U.S. at

7   322-23.

8       The substantive law governing a claim determines whether a

9   fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors

10   Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as

11   to the existence of a genuine issue of fact must be resolved

12   against the moving party.  Matsushita Elec. Indus. Co. v. Zenith

13   Radio, 475 U.S. 574, 587 (1986).  The court should view inferences

14   drawn from the facts in the light most favorable to the nonmoving

15   party.  T.W. Elec. Serv., 809 F.2d at 630-31.

16       If the factual context makes the nonmoving party's claim as to

17   the existence of a material issue of fact implausible, that party

18   must come forward with more persuasive evidence to support his

19   claim than would otherwise be necessary.  Id.; In re Agricultural

20   Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);

21   California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,

22   Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

23                         DISCUSSION

24       Plaintiff's section 1981 claim has three parts:  (1) disparate

25   treatment, (2) hostile environment, and (3) retaliation.  I address

26   them in turn, before discussing the IIED claim.

27   / / /

28   / / /

13 - OPINION & ORDER

I.  Section 1981 Claim

     A.  Section 1981 Claims Generally

     "Among other things, § 1981 guarantees 'all persons' the right to 'make and enforce contracts.'"  <u>Johnson v. Riverside Healthcare Sys, LP</u>, 534 F.3d 1116, 1122 (9th Cir. 2008) (quoting 42 U.S.C. § 1981(a)).  "This right includes the right to the 'enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship,' including the relationship between employer and employee."  <u>Id.</u> (quoting section 1981(b)).

     In the employment context, courts apply Title VII standards to section 1981 claims.  <u>See</u> <u>Manatt v. Bank of America, NA</u>, 339 F.3d 792, 797 (9th Cir. 2003) (the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action").

     A plaintiff may prevail on summary judgment by providing direct evidence of discrimination or by relying on circumstantial or indirect evidence and satisfying the burden-shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981). <u>See</u> <u>Cornwell v. Electra Cent. Credit Un.</u>, 439 F.3d 1018, 1028-30 (9th Cir. 2006).

     The burden-shifting framework requires the plaintiff to establish a prima facie case of unlawful discrimination followed by the defendant articulating a legitimate, nondiscriminatory reason for its action.  <u>McGinest v. GTE Serv. Corp.</u>, 360 F.3d 1103, 1122 n. 16 (9th Cir. 2004).  If the defendant does so, the plaintiff must show that the articulated reason is a pretext for discrimination.  <u>Id.</u>; <u>Aragon v. Republic Silver State Disposal, Inc.</u>, 292 F.3d 654, 658-59 (9th Cir. 2002).

14 - OPINION & ORDER

1    Defendant notes that the statute of limitations on section

2   1981 claims is four years. Jones v. R.R. Donnelley & Sons Co., 541

3   U.S. 369, 382-83 (2004); Thinket Ink Info. Resources, Inc. v. Sun

4   Microsystems, Inc., 368 F.3d 1053, 1060-61 (9th Cir. 1004); 28

5   U.S.C. § 1658.  Plaintiff filed this action on February 5, 2010.[3]

6   As a result, defendant states it is entitled to summary judgment on

7   plaintiff's section 1981 claim to the extent it is based on events

8   which occurred before February 5, 2006.

9    In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101,

10   113 (2002), the Supreme Court limited the use of the continuing

11   violation theory in some contexts.  The Court made an important

12   distinction between disparate treatment discrimination and

13   retaliation claims on the one hand, and hostile environment claims

14   on the other.  536 U.S. at 115.  "Hostile environment claims are

15   different in kind from discrete acts.  Their very nature involves

16   repeated conduct."  Id.  "A hostile work environment claim is

17   composed of a series of separate acts that collectively constitute

18   one 'unlawful employment practice.'"  Id. at 117.  Because a

19   hostile environment claim "encompasses a single unlawful employment

20   practice," the employee "need only file a charge within [the

21   applicable limitations period] of any act that is part of the

22   hostile work environment."  Id. at 117, 119.

23    In contrast, discrete acts are incidents of discrimination,

24   "such as termination, failure to promote, denial of transfer, or

25   refusal to hire," that constitute a separate, actionable "unlawful

26

27

28    [3] Plaintiff filed the case in state court on that date, and
defendant later removed the action to this Court.

15 - OPINION & ORDER

1  employment practice" and which are "not actionable if time barred,
2  even when they are related to acts alleged in timely filed
3  charges." Id. at 113, 114.

4      As discussed below, none of plaintiff's alleged adverse
5  employment actions occurred before February 5, 2006, so none of
6  them are time-barred.  The alleged retaliatory termination also
7  occurred after that date, so it is similarly timely.  As to the
8  hostile environment claim, because, as discussed below, the acts of
9  Wetten at the Waterview site are part of a pattern of conduct which
10 continued into the limitations period, none of the hostile
11 environment claim is time-barred.

12     B.  Disparate Treatment Claim

13     To establish a prima facie case of race discrimination,
14 plaintiff must show (1) that he is African-American; (2) that he
15 performed his job adequately; (3) that he suffered an adverse
16 employment action; and (4) that similarly situated individuals
17 outside his protected class were treated differently. Cornwell,
18 439 F.3d at 1031.

19     There is no question that plaintiff is African-American.
20 Defendant does not challenge that plaintiff performed his job
21 adequately.

22     In his memorandum in opposition to the summary judgment
23 motion, plaintiff appears to raise five discrete adverse employment
24 actions taken against him:  (1) subjection to habitual harassment
25 and discrimination by Achenbach, his supervisor, because of his
26 race; (2) working in conditions where he was subjected to racial
27 slurs and harassment by his co-workers; (3) knowledge by human
28 resources staff and management of the racial slurs and harassment

16 - OPINION & ORDER

occurring at the workplace and allowing the atmosphere of racial discrimination to continue; (4) being treated differently than his non-African-American co-workers; (5) being terminated because of his race.  Pltf Resp. Mem. at p. 9.

I agree with defendant that the first three are not cognizable as adverse employment actions.  For the purposes of a discrimination claim, an adverse employment action is one which "materially affects the compensation, terms, conditions, or privileges of employment." Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotation, brackets, and ellipsis omitted); see also Kang v. U. Lim Am., Inc., 296 F.3d 810, 818-19 (9th Cir. 2002) (plaintiff established a prima facie case of disparate treatment where the defendant subjected the plaintiff to adverse employment actions including discriminatory overtime, and termination, "that constituted a material change in the terms and conditions of [the plaintiff's] employment") (internal quotation omitted); Chuang v. University of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1126 (9th Cir. 2000) (finding that "[t]he removal of or substantial interference with work facilities important to the performance of the job constitutes a material change in the terms and conditions of a person's employment" and therefore qualifies as an adverse employment action, but also finding that the employer's failure to respond to grievances did not amount to an adverse employment action because "it did not materially affect the compensation, terms, conditions, or privileges of the [plaintiffs'] employment"); Kortan v. California Youth Auth., 217 F.3d 1104, 1113 (9th Cir. 2000) (no adverse employment action when the plaintiff was not demoted, not stripped of work responsibilities, not handed

17 - OPINION & ORDER

1   different or more burdensome work activities, not fired or
2   suspended, not denied any raises, and not reduced in salary or any
3   other benefit); Campos v. Portland Public Schs., No. 99-1744-MA,
4   2000 U.S. Dist. Lexis 21617, at *16-17 (D. Or. Nov. 9, 2000) (no
5   adverse employment action when plaintiff's job demotion was not
6   accompanied by any salary or status change or any indication that
7   her new position was less favorable).

8       As suggested in Morgan in the context of addressing the
9   continuing violation theory, a disparate treatment claim involves
10  discrete, tangible acts and thus, I agree with defendant that the
11  first three alleged adverse employment actions listed by plaintiff
12  are part of the hostile environment claim because habitual
13  harassment by Achenbach, being subjected to racial slurs and
14  harassment by co-workers, and management's failure to do anything
15  to address the situation are not discrete acts and do not, without
16  more, materially affect the compensation, terms, conditions, or
17  privileges of plaintiff's employment in a tangible way.

18      As for the termination allegation, I do not read plaintiff's
19  memorandum to suggest that the termination is a separate basis for
20  the disparate treatment claim because his argument regarding the
21  termination is that the termination was in retaliation for having
22  complained to Stevens about the racial slurs.  Thus, I agree with
23  defendant that the allegations based on termination are properly
24  analyzed under the retaliation part of the section 1981 claim, not
25  as a disparate treatment claim.

26      Thus, for an adverse employment action, what remains is
27  plaintiff's allegation that he was treated differently than non-
28  African-American co-workers.  To support this argument, plaintiff

18 - OPINION & ORDER

identifies one discrete, tangible adverse employment action where he was treated differently than a non-African-American employee: receiving discipline for calling Castillo a "wetback," while Caucasian employees, whom management knew also used racial slurs, received no discipline. As described above, plaintiff received a written warning as a result of his insult to Castillo. The evidence shows that certain supervisory personnel knew about Wetten's use of the words nigger, or nigger-head, or African ingenuity, yet he received no written warning. Erwin also used the term nigger-rigged and Gray did not discipline her when he learned of the incident. Robertson and Achenbach apparently employed certain slurs such as "beaner" (both Achenbach and Robertson), as well as "wetback" and "spic" (Robertson), without written discipline.

Plaintiff has raised material issues of fact with respect to his treatment being different than Caucasian employees for the use of racial slurs. But, the written warning he received is not an adverse employment action under the law. One Ninth Circuit case holds that a written warning placed in an employee's personnel file can constitute an adverse employment action under certain circumstances. Fonseca v. Sysco Food Servs. of Az., Inc., 374 F.3d 840, 848 (9th Cir. 2004). In Fonseca, the employee was initially suspended for an incident, with the suspension then reduced to a warning letter. Id. The Ninth Circuit held that the "warning letter still constitutes an adverse employment action, particularly since Sysco publicizes all discipline to all its employees." Id. (citing Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) ("Transfers of job duties and undeserved performance ratings, if

19 - OPINION & ORDER

1  proven, would constitute 'adverse employment decisions[.]'").

2      _Fonseca_, and the case on which it relied _Yartzoff_, are
3  distinguishable from the instant case.  First, unlike _Fonseca_,
4  there is no evidence here that plaintiff's warning letter became
5  public or was broadcast in any way to all other employees.  Second,
6  while _Fonseca_ was not a retaliation case, _Yartzoff_, the case it
7  cited for the proposition that a warning letter or negative review
8  can be considered an adverse employment action, was a retaliation
9  case.  The concept of "adverse employment action" is more broadly
10 construed in the retaliation context than in the substantive
11 discrimination context in a disparate treatment claim.  _Burlington_
12 _N. & Santa Fe Rwy Co. v. White_, 546 U.S. 53, 60-63 (2006) (anti-
13 retaliation provision of Title VII, unlike the substantive
14 provision, is not limited to discriminatory actions that affect the
15 terms and conditions of employment; defining adverse employment
16 action for purposes of retaliation claims as an action that a
17 reasonable employee would have found materially adverse, meaning
18 action that "might have dissuaded a reasonable worker from making
19 or supporting a charge of discrimination") (internal quotation
20 omitted).  Thus, _Fonseca_, the non-retaliation case, inappropriately
21 cited to _Yartzoff_, the retaliation case, for the proposition that
22 a warning letter with no material impact on the employee's working
23 conditions, constitutes an adverse employment action in a disparate
24 treatment claim.

25     Additionally, several cases in this district hold that a
26 warning letter is not an adverse employment action.  _E.g._, _Hoang v._
27 _Wells Fargo Bank, N.A._, 724 F. Supp. 2d 1094, 1104 (D. Or. 2010)
28 (warning letter which affected no materially adverse change in the

20 - OPINION & ORDER

1  terms and conditions of the plaintiff's employment was not an
2  adverse employment action); Tudor Delcey v. A-Dec, Inc., No. CV-05-
3  1728-PK, 2008 WL 123855, at *9 (D. Or. Jan. 9, 2008) (written
4  warning was not an adverse employment action when it had no impact
5  on the employee's status).

6      Here, the written warning plaintiff received for the racial
7  slur to Castillo is not an adverse employment action.  Because this
8  is the only allegedly adverse action plaintiff cites in support of
9  his disparate treatment claim, I grant summary judgment to
10 defendant on that part of plaintiff's section 1981 claim.

11     C.  Hostile Environment Claim

12     To establish a prima facie case for a hostile work environment
13 claim, plaintiff "must raise a triable issue of fact as to whether
14 (1) the defendants subjected [him] to verbal or physical conduct
15 based on [his] race; (2) the conduct was unwelcome; and (3) the
16 conduct was sufficiently severe or pervasive to alter the
17 conditions of [his] employment and create an abusive working
18 environment."  Surrell v. California Water Serv. Co., 518 F.3d
19 1097, 1108 (9th Cir. 2008).

20     Defendant argues that plaintiff fails to create an issue of
21 fact as to whether the conduct was sufficiently severe or
22 pervasive.  I disagree.

23     First, the evidence is that Wetten regularly used the word
24 "nigger" in some manner around plaintiff beginning in August 2005,
25 at the inception of plaintiff's employment at Waterview, until
26 plaintiff went on medical leave and left Waterview in December
27 2006.  This pattern of similar conduct continued into the post-
28 February 5, 2006 limitations period, satisfying Morgan's conditions

21 - OPINION & ORDER

for application of the continuing violation doctrine in a hostile environment claim.

Examining the facts in a light most favorable to plaintiff, the evidence is that Wetten regularly used the term "nigger" around plaintiff, that he would apologize for using it at times, but would resume using it again.  Wetten admits he used the term around plaintiff in the workplace.  Plaintiff's testimony is that this occurred regularly, more frequently than every other week.  The evidence is also that Wetten used the term "nigger-heads" when referring to the rocks in the roadbed, and used, at least once, the term "nigger-rigged," and referred to an attempt to fix malfunctioning equipment as "African ingenuity."

Although there is a dispute in the record regarding whether plaintiff's supervisor Russell and the Waterview site supervisor Druery knew about Wetten's regular use of the term nigger, plaintiff's testimony must be credited on summary judgment. Plaintiff states that he reported the use of the word to Russell and Druery, and, moreover, that Russell and Druery themselves heard Wetten use the term.  According to plaintiff, Russell and Druery did nothing about it.  Druery does admit to hearing Wetten use the term "nigger-rigged," and then "African ingenuity," and other than verbally warning Wetten, he issued no discipline.

In addition, plaintiff described hearing Henshaw state over the radio that "Dave's black ass is going to work today."  And, Wetten testified that Henshaw used the word nigger around plaintiff.

At Linnton, where plaintiff was transferred after his medical leave, the specific evidence regarding use of the word "nigger"

22 - OPINION & ORDER

1   shows less frequent use than by Wetten at Waterview.  At Linnton,
2   plaintiff overheard Robertson and Achenbach using the word "nigger"
3   in reference to plaintiff only once, when he walked into the office
4   after hitting the batch office porch with the loader.  But, Branson
5   told plaintiff that Branson had overheard Achenbach and Robertson
6   use the word nigger to refer to plaintiff and Campbell, although
7   there is no evidence showing that they did this in plaintiff's
8   presence.  And, Castillo told plaintiff that he heard Achenbach or
9   Robertson use derogatory words towards plaintiff and Campbell,
10  including Achenbach referring to Campbell as a "stupid, fucking
11  nigger" when he had problems backing up a truck.

12      Erwin's episode using the term "nigger rigged" in the presence
13  of Campbell and another African-American employee, but not in
14  plaintiff's presence, also occurred at Linnton.    Nontavarnit
15  testified that he heard Robertson use terms like wetback, spic, and
16  beaner, and had heard Achenbach use the term beaner.  Additionally,
17  plaintiff saw the offensive pictures of then-candidate Obama.

18      In describing the evidence, defendant accurately describes the
19  events at Waterview, but minimizes the incidents at Linnton by
20  omitting any reference to Erwin's comment or to the evidence that
21  co-workers told plaintiff that Achenbach and Robertson referred to
22  him as nigger and used derogatory words toward plaintiff and
23  Campbell.

24      Defendant relies on a 1990 Ninth Circuit case to argue that
25  the evidence here falls short of suggesting a hostile environment.
26  In Sanchez v. City of Santa Ana, 936 F.2d 1027 (9th Cir. 1990), the
27  court affirmed a directed verdict in favor of the defendant on a
28  hostile environment claim where Hispanic police officers relied on

23 - OPINION & ORDER

1  evidence that a racially offensive cartoon had been posted, there
2  had been use of racially offensive slurs, they had been assigned
3  unsafe vehicles, they were victims of selective enforcement of
4  police department rules and peer ostracism, they failed to receive
5  adequate police backup, and secret personnel files had been
6  maintained. Id. at 1031, 1037.

7     Moreover, defendant argues, the single time plaintiff
8  complained to human resources, defendant investigated the matter
9  and took corrective action to the extent it was needed.  Thus,
10 defendant argues, the evidence in this case belies plaintiff's
11 claim that defendant condoned a hostile work environment.

12    But, as plaintiff notes, the use of the word "nigger" is
13 especially offensive.  E.g., Swinton v. Potomac Corp., 270 F.3d
14 794, 817 (9th Cir. 2001) (the word "nigger" is "perhaps the most
15 offensive and inflammatory racial slur in English, . . . a word
16 expressive of racial hatred and bigotry") (internal quotation
17 omitted); Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130
18 F.3d 349, 356 (8th Cir. 1997) (the "use of the word 'nigger,' even
19 in jest, can be evidence of racial antipathy") (internal quotation
20 omitted); McGinest, 360 F.3d at 1116 ("It is beyond question that
21 the use of the word 'nigger' is highly offensive and demeaning,
22 evoking a history of racial violence, brutality, and
23 subordination").

24    Without question, the conditions at Waterview at least create
25 a question of fact as to whether they were sufficiently severe or
26 pervasive to support a hostile environment claim under section
27 1981.   No separate discussion of the conditions at Linnton is
28 required.   Defendant brings only one motion, and the evidence

24 - OPINION & ORDER

regarding what occurred at Waterview is enough to create an issue of fact on this claim.

However, even if the events at Linnton were looked at separately, I still deny summary judgment on that aspect of plaintiff's claim. While the incidents at Linnton which plaintiff personally observed are few (only two - hearing one reference by Achenbach/Robertson to plaintiff as a "nigger" and the Obama pictures), his testimony that his co-workers told him that Achenbach and Robertson referred to plaintiff and Campbell as niggers is unrebutted. While it is unclear from plaintiff's testimony what plaintiff understood as to the frequency with which Achenbach and Robertson used the term, the record establishes that he had knowledge of its use. This, coupled with the two overtly racial incidents, are enough for a reasonable factfinder to conclude that the environment at either Waterville or Linnton was severe or pervasive to be considered a hostile environment. My conclusion takes into consideration the particular word "nigger," which, as indicated by the cases above, is so hostile and antagonistic that very few uses are required to make the environment severely hostile.

Additionally, the record, examined in the light most favorable to plaintiff, shows that his complaint to Russell and Druery at Waterville regarding Wetten's repeated use of "nigger" resulted in no action against Wetten. And, when Druery did overhear Wetten use the term "nigger-rigged," he issued an undocumented verbal warning with no other repercussion. When Wetten subsequently used the term "African ingenuity," Druery did nothing more than glare at Wetten. Thus, the supervisory personnel at Waterville were unresponsive to

25 - OPINION & ORDER

1  plaintiff's complaints.

2      At Linnton, a reasonable factfinder could conclude that
3  Stevens's investigation and recommendations were ineffective. At
4  least on summary judgment, when plaintiff states that he tried to
5  call her again, and also called Gray to complain about continued
6  harassment, it can be inferred that defendant's response to
7  plaintiff's August 2007 complaint was ineffective. While
8  plaintiff's deposition testimony regarding any specific incidents
9  of racial harassment that occurred after August 2007, is vague, the
10 evidence in the record regarding his need to call Stevens and Gray
11 subsequent to his August 2007 report and defendant's investigation,
12 because of what plaintiff perceived to be continuing harassment, is
13 unrebutted and suggests that defendant's "remedial measures" in
14 response to the August 2007 complaint were insufficient.

15     Finally, while the perpetrators of the offensive conduct were
16 different at each site, this action is against defendant who is
17 ultimately responsible for the conduct of all of its personnel.
18 Taking the evidence in a light most favorable to plaintiff, the
19 record is capable of showing that defendant tolerated a racially
20 hostile atmosphere at more than one location, that supervisors at
21 both sites either actually engaged in the offensive conduct
22 (Achenbach) or were aware of it (Druery, Russell), and yet the
23 conduct continued. This is sufficient, on summary judgment, to
24 show a pattern of similar conduct at both locations, making summary
25 judgment inappropriate whether the sites are considered singly or
26 together.

27     I deny the motion on the hostile environment claim.

28 / / /

26 - OPINION & ORDER

1  D.  Retaliation Claim

2  "Section 1981 prohibits 'racial discrimination in taking

3  retaliatory action.'" Surrell, 518 F.3d at 1108 (quoting Manatt,

4  339 F.3d at 798).  To establish a prima facie case of retaliation,

5  a plaintiff must prove (1) he engaged in a protected activity; (2)

6  he suffered an adverse employment action; and (3) there was a

7  causal connection between the two. Id. at 1109. Once established,

8  the burden shifts to the defendant to set forth a legitimate,

9  non-retaliatory reason for its actions.  Id.  At that point, the

10  plaintiff must produce evidence to show that the stated reasons

11  were a pretext for retaliation.  Id.

12  There is no dispute that plaintiff engaged in protected

13  activity by making a race discrimination complaint to Stevens in

14  August 2007.  There is no dispute that he was terminated in

15  November 2008.  The issue on summary judgment is the causal

16  connection between these two events.

17  Plaintiff may raise an inference of causation by demonstrating

18  a temporal proximity between the protected activity and any adverse

19  employment action, or, by demonstrating that the person making the

20  employment decision was aware that the person had engaged in the

21  protected activity.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d

22  1054, 1065 (9th Cir. 2001) ("causation can be inferred from timing

23  alone where an adverse employment action follows on the heels of

24  protected activity"); Yartzhoff, 809 F.2d at 1376 ("Causation

25  sufficient to establish the third element of the prima facie case

26  may be inferred from circumstantial evidence, such as the

27  employer's knowledge that the plaintiff engaged in protected

28  activities and the proximity in time between the protected action

27 - OPINION & ORDER

and the allegedly retaliatory employment decision.").

The Ninth Circuit has rejected a bright line temporal proximity test. Coszalter v. City of Salem, 320 F.3d 968, 977-78 (9th Cir. 2003) (noting that retaliation often follows quickly upon the act that offended the retaliator, but that is not always so because for a variety of reasons, some retaliators prefer to take their time and may wait until the victim is especially vulnerable or until an especially hurtful action is possible or until they think the lapse of time disguises their true motivation).

Plaintiff notes that the decisionmakers in his termination were Stevens, Kincaid, and Gray, all of whom knew about his complaint of racial harassment. Although the time between his complaint and his termination is about fifteen months, plaintiff argues that in response to his complaint to Stevens, defendant promptly, and for the first time, questioned his work ethic in an attempt to establish the ground work for later laying him off. He also contends that in September 2007, defendant began to make his transfer to Linnton official, which, plaintiff contends, put him at the bottom of the seniority list, resulting in his being laid off before less senior employees.

### 1. Performance Issues

Plaintiff states that before his complaint to Stevens, he had "met expectations" on his "hourly performance evaluations." He cites to two performance evaluations. Pltf Exh. 9 at pp. 2, 5. One of them is a performance review from July 2008, after his August 2007 complaint to Stevens. Thus, it does not support his position that before his August 2007 complaint to Stevens, he received "met expectations" performance reviews.

1    The other, dated July 2007, does show that in the categories
2  of safety, attitude, quality, and productivity, plaintiff met
3  expectations. Id. at p. 2. In the written comments, as opposed to
4  the check boxes, plaintiff was told to "take more incentive in
5  keeping yard up and work harder at not overflowing bins." Id.
6  Plaintiff identified his own goals as wanting to improve his work
7  habits and relationships with other team members and to keep up on
8  safety requirements. Id.

9    Next, plaintiff points to the comments made in Stevens's
10 investigation summary where she notes that (1) there had been
11 miscommunications between Achenbach and plaintiff regarding leaving
12 at the end of the day, (2) Robertson and Achenbach believed
13 plaintiff was lazy and did not do enough clean up or maintenance
14 work, and only wanted to stay on the loader, despite having been
15 spoken to about doing the other work, and (3) Campbell noticed that
16 plaintiff did not get off the loader to do any labor and
17 maintenance and clean up work around the plant. Id. at p. 12.
18 Based on this, one of Stevens's conclusions was that "[plaintiff]
19 is concerned about losing his job at Linnton and this prompted his
20 complaint. There are legitimate concerns with [plaintiff's] work
21 performance. It is not up to full expectations." Id. One of
22 Stevens's recommended actions was to ensure that plaintiff
23 understood his job responsibilities included plant maintenance,
24 cleanup, and labor. Id.

25    Based on this, plaintiff argues that the evidence shows that
26 before making his complaint to Stevens, he had consistently met
27 expectations in all categories on his performance evaluations, but
28 after making the complaint, defendant began making accusations,

29 - OPINION & ORDER

which began in Stevens's own report, that he was not performing his job up to "full expectations."

I note that the July 2007 performance evaluation does indicate that while plaintiff met expectations, there was a comment that he needed to "take more incentive in keeping yard up and work harder at not overflowing bins." Because it does not appear that either Achenbach or Robertson were involved in issuing this performance evaluation, it is safe to say that before plaintiff made his complaint to Stevens, there was an issue with his failure to "keep up the yard," which I understand to mean the general maintenance and clean up which Achenbach and Robertson later complained about to Stevens as part of her investigation.

Defendant also notes that while at Waterview, plaintiff had received two verbal warnings, one for an unexcused absence and another for unsafe operation of a truck. Pltf Depo. at pp. 54-56; Exh. 3 to Second Schmidt Declr. at pp. 5, 6. In addition, at Linnton, he received a verbal warning for damaging the porch of the batch office with the loader. Pltf Depo. at pp. 76-80; Deft Exh. 7 at p. 2.

Defendant further notes that it is undisputed that Achenbach, Robertson, and Campbell (himself African-American) told Stevens during her investigation of plaintiff's complaint, that plaintiff's job performance was lacking because he did not perform enough clean up and maintenance. Thus, defendant argues that there is no evidence to support plaintiff's theory that in response to his complaint about racial slurs, Stevens immediately set out to find fault with plaintiff's job performance.

Clearly, the reports by Achenbach and Robertson to Stevens

30 - OPINION & ORDER

regarding plaintiff's poor work habits were made after plaintiff complained about their treatment of him, and thus, considering the evidence in a light most favorable to plaintiff, their statements could have been made in retaliation for his complaint. However, as noted above, there is evidence in the July 2007 evaluation, which did not involve Achenbach and Robertson, that plaintiff had work habit problems. And, Campbell, plaintiff's African-American co-worker, also complained to Stevens about plaintiff.

Defendant also states that plaintiff's "met expectations" job evaluation in July 2008 disproves his theory that defendant, through Achenbach, Robertson, and Stevens, began a plot to terminate plaintiff as soon as he complained about racial harassment by noting performance problems. In July 2008, plaintiff was again rated as "meets expectations" in the categories of safety, attitude, quality, and productivity. Pltf Exh. 9 at p. 5. In the comment section, he was told that he needed to work on not overloading bins and to understand that "bin bleedover" affects the quality of the concrete. Id. He was also expected to obtain his commercial driver's license within a year, before his next evaluation. Id. I agree with defendant that the "meets expectations" July 2008 performance review undermines plaintiff's theory.

In summary, the evidence shows that contrary to plaintiff's argument, he had some noted performance problems before his complaint to Stevens. The evidence also shows that an independent African-American co-worker made the same complaint to Stevens during the investigation of plaintiff's race harassment complaint, lending some validation to Achenbach's and Robertson's complaints,

31 - OPINION & ORDER

and creating doubt that those particular comments were motivated by plaintiff's race harassment complaint.  And, despite plaintiff's argument about defendant laying the groundwork for his layoff with poor performance comments immediately after his complaint, he received a "meets expectations" performance evaluation subsequent to his complaint.  Thus, the evidence plaintiff relies on to support his argument is quite slim.

This is a close question regarding what the evidence shows as to plaintiff's race harassment complaint triggering negative performance issues.  There are some inferences to be made, but, given the length of time between his complaint and his actual layoff, and the fact that subsequent to his complaint he received a meets expectation performance review, they are weak. Nonetheless, given that Kincaid rated plaintiff's abilities in the layoff document, conceded that he believed plaintiff had a poor attitude compared with other Linnton employees, and was one of the decisionmakers in plaintiff's termination decision, it is possible that a factfinder could conclude that the seeds for plaintiff's layoff were initially planted soon after his August 2007 complaint, creating an issue of fact as to causation.  Although sufficient to survive summary judgment, I note that at trial, depending on how the evidence comes in, a motion for judgment as a matter of law may result in the dismissal of this claim before it is sent to a jury.

2.  Reassignment

Plaintiff next argues that shortly after his racial harassment complaint, the decisionmakers involved in his termination, all of whom were aware of his complaint, began making plans to transfer him or possibly lay him off, and that this shows causation.

32 - OPINION & ORDER

1    Plaintiff points to an email from Kincaid, dated September 4,

2  2007, to Gray and Stevens.    Pltf Exh. 9 at pp. 14-15.    There,

3  Kincaid  proposed  sending  plaintiff  back  to  Waterview,  under

4  Druery's supervision.    Id.  Kincaid explained that plaintiff, upon

5  returning from medical leave in February 2007, had been assigned to

6  the  Linnton  site  due  to  a  temporary  need  for  a  loader  operator

7  there,  created  by  the  reassignment  of  the  other  Linnton  loader

8  operators  to  two,  separate  "portable  projects."  Id.  One  of  those

9  portable  projects  was  closing  on  August  31,  2007,  and  the  other  one

10  was  going  to  close  a  few  months  later,  with  the  employees  due  to

11  return  to  the  metro  ready  mix  operations.    Id. at p. 15.

12    Kincaid  proposed  sending  plaintiff  back  to  Waterview  or  to

13  another  site  named  Angell  Quarry.    He  noted  that  Druery  had

14  indicated  the  move  was  okay  with  him,  and  that  between  Waterview

15  and  Angell  Quarry,  he  would  find  work  for  plaintiff,  with  a  last

16  resort  being  a  lay  off.    Id.

17    Then, Kincaid stated that

18    [i]n light of the recent events at Linnton RM involving
     [plaintiff, Achenbach, and Robertson,] I realize this
19    move could be viewed incorrectly. The fact of the matter
     is that this move was the plan from the beginning.  Both
20    [plaintiff's and []] assignments at Linnton RM were
     *temporary assignments* for the benefit of the company as
21    a  whole  to  allow  Ron  [Trommlitz]  to  supervise  the
     portable RM projects and also to allow for Jim Dumolt's
22    retirement to proceed as requested.  This is why neither
     was officially transferred from the Materials Group to
23    the Metro RM Group.

24    To me this is the right move.  However, due to recent
     events at Linnton RM, I would like your review and
25    approval.   I  do  not  want  to  put  our  company  at  any
     unnecessary risk although this has been the planned
26    transition since the beginning of the portable projects.

27  Id.

28    In the end, plaintiff was not moved back to Waterview.  In his

33 - OPINION & ORDER

deposition, Kincaid explained that based on a conversation with Druery in which Druery stated that the position plaintiff had been working at Waterview was now filled and Druery did not, in fact, really have a place for plaintiff, Kincaid decided to have plaintiff formally join the ready mix division in Lintton. Kincaid Depo. at pp. 43-44. Based on a conversation with plaintiff that plaintiff would get his commercial driver's license, Kincaid believed defendant could use plaintiff in the ready mix division in different capacities other than as a loader. Kincaid Depo. at pp. 43-44.

Thus, plaintiff was officially transferred to Linnton in December 2007, where he had been working since February 2007. Pltf Exh. 9 at p. 3. The actual transfer paperwork is dated December 17, 2007, and states that plaintiff was transferred from Waterview to Linnton with the following conditions: (1) "[c]ompany date of hire remains intact, new location seniority established upon transfer"; (2) wages remained at $17.97 per hour; (3) first full performance evaluation to occur ninety days from transfer. Id.

Plaintiff contends that the official transfer to Waterview caused him to lose all of his seniority which in turn, made him first on the list to be laid off. Plaintiff states that absent the transfer from Waterview to Linnton, there would have been at least six employees with less seniority who would have been laid off instead of plaintiff. Those employees are James Armspiger, Irv Sisco, Mike Price, Ryan Shaw, John Connall, and Bruce Aberle. See Pltf Exh. 9 at p. 17 ("crusher scorecard" showing list of nineteen employees, including plaintiff, rated in five areas on a numerical scorecard, and showing hire dates). Plaintiff states that

34 - OPINION & ORDER

Armspiger and Price were both groundsmen like plaintiff, had been hired after plaintiff, and did not possess commercial drivers' licenses.   Plaintiff contends that had he not been transferred, there would have been several other employees that would have been up for layoff consideration before plaintiff.

Plaintiff cites to two pages of defendant's employee handbook, effective October 1, 2008.  Pltf Exh. 10.  Assuming that this, or a similar version was in effect in December 2007 when plaintiff was transferred to Linnton, the transfer section states, in relevant part, that upon a transfer, "[d]epartment seniority will not pass with you.  However, Knife River seniority for vacation, insurance, and profit-sharing will remain uninterrupted."   Id. at p. 2 (emphasis added).

In the "Anniversary" section, it is explained that

> [t]he date of employment establishes an anniversary date. Your employment category and anniversary date determines your eligibility for group benefits.  Length of service or seniority, together with your qualifications and abilities play an important role in helping us determine eligibility for promotion or transfer.  Your relative seniority standing and qualifications also enter into decisions as to who will be laid off in a reduction of work force and the order in which laid-off personnel are called back to work.
>
> Your seniority is broken in these circumstances:
>
> - Termination of employment for any reason.
> - Continuous absence from work for more than six (6) consecutive months due to layoff.
> - Failure to return to work when recalled following a layoff.
> - Failure to return to work immediately following a doctor's release to return after any work related or non-work related injury or illness.
>
> The years of service you acquire in your employment are important.  Knife River hopes that you will recognize their value and that you will not act in such a way as to lose them without careful thought and good reason on your part.

35 - OPINION & ORDER

1  Id. at p. 3 (emphasis added).

2      The "anniversary" section suggests that the date of employment
3  is the date used for determining seniority for lay off purposes.[4]
4  Plaintiff's transfer to Linnton does not fall under any of the four
5  events which cause an employee's seniority to be broken, suggesting
6  that his hire date did not change for seniority purposes when he
7  was transferred.

8      However, there is no explanation of the meaning of "department
9  seniority" which does not pass with the employee upon a transfer.
10  Thus, the handbook is ambiguous.  Although the timing of the August
11  2007 racial discrimination complaint is pretty far removed from the
12  November 2008 termination, there are issues of fact regarding the
13  seniority issue.  Plaintiff's official reassignment to Linnton
14  occurred in December 2007, within the window of time which allows
15  an inference of causation.  The handbook is unclear what
16  "department seniority" is and without an explanation of that in the
17  record, plaintiff's theory that the reassignment set him up to be
18  first in line for layoff, is a reasonable inference.

19      Additionally, as plaintiff notes, the decisionmakers for the
20  transfer were aware of his race discrimination complaint, and Gray
21  allegedly told Kincaid that Bull was going to be glad to obtain the
22  waiver from plaintiff.  This is enough to create an issue of fact
23  on causation based on plaintiff's seniority theory.  Again,

24

25      [4] Remarkably, defendant states that "[m]ore importantly,
    however, is the absence of any evidence in the record that
26  seniority is even a factor that Knife River takes into
    consideration in determining which employees to terminate during
27  a reduction in force.  This is perhaps the most glaring of all
    evidentiary deficiencies in plaintiff's theory of causation."
28  Deft Reply Mem. at p. 13.

36 - OPINION & ORDER

1  however, I consider the causation evidence to be fairly weak and
2  the totality of the evidence at trial may suggest a different
3  result.

4      In summary on the section 1981 claim, I grant the motion as to
5  the disparate treatment part of the claim, but I deny the motion on
6  the hostile environment and retaliation claims.

7  II.  IIED Claim

8      To sustain an IIED claim, plaintiff must show that defendant
9  intended to inflict severe emotional distress, that defendant's
10 acts were the cause of plaintiff's severe emotional distress, and
11 that defendant's acts constituted an extraordinary transgression of
12 the bounds of socially tolerable conduct.  McGanty v. Staudenraus,
13 321 Or. 532, 563, 901 P.2d 841, 849 (1995); see also Babick v.
14 Oregon Arena Corp., 333 Or. 401, 411, 40 P.3d 1059, 1063 (2002) (to
15 state an IIED claim under Oregon law, plaintiff must prove, inter
16 alia, that defendants' actions "constituted an extraordinary
17 transgression of the bounds of socially tolerable conduct.")
18 (internal quotation omitted).

19     As a result of some clarification in plaintiff's response
20 memorandum, it appears that plaintiff bases his claim on certain
21 acts by Achenbach and Robertson at the Linnton plant, for which
22 defendant is vicariously liable.  The actions are (1) the May 18,
23 2007 incident when plaintiff overheard Achenbach and/or Robertson
24 use the word "nigger" in referring to plaintiff; (2) the reports by
25 co-workers that they overheard Achenbach and Robertson use the word
26 "nigger" in reference to plaintiff and Campbell; (3) that Achenbach
27 and Robertson wanted to get rid of plaintiff because he was
28 African-American.

1    Defendant first notes that the statute of limitations is two
2  years for the IIED claim, making any incidents before February 5,
3  2008, not actionable.  Or. Rev. Stat. § 12.110(1).  Accordingly, I
4  agree with defendant that the May 2007 reference by Achenbach or
5  Robertson to plaintiff as a nigger, which plaintiff overheard, is
6  not a part of this claim.

7    Second, defendant argues that the evidence does not support
8  either the intent or outrageous elements.  With the May 2007
9  comment by Achenbach or Robertson considered untimely, there is no
10  evidence in support of the IIED claim showing that plaintiff
11  himself heard either Achenbach or Robertson use the word "nigger,"
12  meaning there is no evidence that the epithet was ever directed at
13  plaintiff in his presence within the actionable time period.
14  Plaintiff did not witness the incidents his co-workers told him
15  about.  Thus, even assuming that Achenbach and Robertson made the
16  comments attributed to them by plaintiff's co-workers, they did so
17  outside of plaintiff's presence.  This, defendant argues, fails to
18  show that Achenbach and Robertson intended to cause plaintiff
19  severe emotional distress.

20    I agree.  Intent is defined to mean "where the actor desires
21  to inflict severe emotional distress, and also where he knows that
22  such distress is certain, or substantially certain, to result from
23  his conduct."  McGanty, 321 Or. at 550, 901 P.2d at 853 (internal
24  quotation and emphasis omitted).  I do not question the offensive,
25  inflammatory, and demeaning nature of the term "nigger."  Nor will
26  I quibble here over whether anger, anxiety, fear, depression, or
27  any particular variety of emotional distress is or is not the sort
28  to support this element of the tort.  However, the defendant must

38 - OPINION & ORDER

intend to cause the plaintiff emotional distress, and that the distress be severe.

Comments made outside of plaintiff's presence fail to show that Achenbach or Robertson intended to cause plaintiff emotional distress or that they were certain or substantially certain that such use of the term would cause plaintiff severe emotional distress. In other cases analyzing an Oregon IIED claim where the use of racial or sexual slurs has occurred, the comments have been directed at the victim in his or her presence, and there has been other offensive conduct as well. E.g., Whelan v. Albertson's, Inc., 129 Or. App. 501, 504-06, 879 P.2d 888, 891 (1994) (plaintiff's supervisor and co-worker repeatedly referred to plaintiff as "queer" and imitated his allegedly effeminate characteristics in front of plaintiff and other employees, plaintiff's supervisor asked plaintiff if he had "fucked" a woman he dated, the plaintiff's co-worker called plaintiff a "fucking queer asshole," and the co-worker shoved the plaintiff hard in the chest, among other things); Lathrope-Olson v. Department of Transp., 128 Or. App. 405, 408, 876 P.2d 345, 347 (1994) (when defendant's overtly racist and sexual comments were directed to plaintiff and defendant engaged in other acts of psychological and physical intimidation, summary judgment to employer was improper); Franklin v. Portland Comm. College, 100 Or. App. 465, 467, 469-72, 787 P.2d 489, 490, 491-83 (1990) (supervisor's use of racial epithet "boy," directed to African-American employee, along with issuing false reprimands, attempting to lock him in an office, and suggesting that he apply for a different job with another employer, were enough to show continual verbal and physical harassment such

39 - OPINION & ORDER

1  that, if proven, the plaintiff could show that the supervisor had

2  the specific intent to cause the plaintiff severe emotional

3  distress).   Without more, racially charged comments about

4  plaintiff, not made in his presence, fail to create an issue of

5  fact on the intent element of the IIED claim.

6       As to the other allegation regarding Achenbach's and

7  Robertson's desire to "get rid" of plaintiff, defendant initially

8  challenges the admissibility of the evidence supporting this

9  allegation, and then argues that even considering it, it does not

10 support plaintiff's claim.  I address the evidentiary objection in

11 a separate section of this Opinion.  However, even considering the

12 evidence, I agree with defendant.

13      There are two pieces of evidence plaintiff relies on to

14 support his contention that Achenbach and Robertson wanted to get

15 rid of him because he is African-American.  First is an October 6,

16 2009 letter written by Robertson after his termination in which he

17 writes "To Whom it May Concern," and takes issue with Achenbach's

18 role as a supervisor.  Pltf Exh. 9 at pp. 6-7.  He states that

19 Achenbach "abused his position in the [company] against co-workers

20 under his supervision.  Id.  Robertson states that he could recall

21 "one specific incident, when [Achenbach] asked me to provoke other

22 co-workers of a specific race into losing their jobs."  Id.

23      The other piece of evidence is a statement by African-American

24 employee Ratcliff during Stevens's investigation into a race

25 discrimination complaint by Campbell against Achenbach.  Ratcliff

26 told Stevens that Ratcliff had "NEVER heard [Achenbach] say

27 anything discriminatory 1st hand, but . . . Joe Robertson told

28 [Ratcliff] that [Achenbach] said that he wanted to get rid of

40 - OPINION & ORDER

1  [plaintiff] first, [Campbell] second, and [Ratcliff] third.

2  [Ratcliff] was not sure that this was true, but it if was, it would

3  be suspicious since they were all three black." Pltf Exh. 9 at p.

4  11.

5      I note that first, neither piece of evidence implicates

6  Robertson as desiring to get rid of plaintiff, for any reason. Any

7  ill motive is alleged to have been held by Achenbach only. Second,

8  again, the evidence is that Achenbach shared certain feelings with

9  Robertson about a desire to get rid of certain employees. Neither

10 statement attributed to Achenbach includes any overt racial

11 reference or slur, and, even if one can be inferred, the statements

12 were not made directly to plaintiff. Without more, the evidence is

13 not capable of allowing a reasonable factfinder to conclude that

14 Achenbach intended to cause plaintiff severe emotional distress or

15 was certain, or substantially certain, such distress would occur

16 because of Achenbach's conduct. Assuming Achenbach wanted

17 plaintiff gone from the work place is not the same as inferring

18 that he intended to cause plaintiff severe emotional distress.

19     I grant summary judgment to defendant on the IIED claim.

20 III.  Evidentiary Objections

21     Defendant objects to the admission of Robertson's October 6,

22 2009 letter, and Ratcliff's statements to Stevens during her

23 investigation of Campbell's race harassment complaint.

24     I did not consider the evidence in regard to the section 1981

25 claim, and even considering it as part of the IIED claim, I grant

26 defendant's motion. Thus, it is unnecessary to resolve the

27 evidentiary objections.

28     However, I note that with both exhibits, plaintiff ultimately

41 - OPINION & ORDER

relies on Federal Rule of Evidence 801(d)(2)(D) to argue that the statements attributed to Achenbach by Robertson in his letter, or by Ratcliff in his statements to Stevens, are admissible as statements of a party's agent concerning a matter within the scope of the agency or employment, made during the existence of the employment relationship.

The proponent of allegedly non-hearsay evidence consisting of a statement by a party's agent, has the burden to demonstrate the foundational requirement that the statement related to a matter within the scope of the witness's agency or employment. United States v. Chang, 207 F.3d 1169, 1176 (9th Cir. 2000). Facts regarding the agent's duties are clearly relevant to the analysis. See, e.g., Sana v. Hawaiian Cruises, Ltd., 181 F.3d 1041, 1045-46 (9th Cir. 1999) (analyzing facts regarding scope of agency); City of Long Beach v. Standard Oil Co. of Calif., 46 F.3d 929, 937 (9th Cir. 1995) (affirming exclusion of agent's statements because of proponent's failure to include in the record any evidence regarding agent's role in company).

Here, plaintiff fails to a create a record supporting the admission of Achenbach's statements under Rule 801(D)(2)(d). There is no evidence regarding Achenbach's job description, his actual duties, or his authority to fire employees. Without such information, the record does not show that the statements attributed to him concerned a matter within the scope of his agency.

CONCLUSION

Defendant's summary judgment motion [20] is granted as to the disparate treatment section 1981 claim, is denied as to the other

42 - OPINION & ORDER

1   bases of the section 1981 claim, and is granted as to the IIED

2   claim.

3        IT IS SO ORDERED.

4                    Dated this  8th    day of  March        , 2011

5

6

7                              /s/ Dennis James Hubel
                               Dennis James Hubel
8                              United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

43 - OPINION & ORDER